535 S.E.2d 737

**Carolyn M. ARMOR and Richard T. Armor, Jr., Plaintiffs Below, Appellants,**

v.

**George LANTZ, Defendant Below, Appellee.**

No. 26432.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 25, 2000.

Decided July 14, 2000.

---

Harry G. Deitzler, Esq., James C. Peterson, Esq., Hill, Peterson, Carper, Bee & Deitzler, PLLC, Charleston, West Virginia, Attorneys for Appellants.

Robert L. Bays, Esq., Bowles Rice McDavid Graff & Love PLLC, Parkersburg, West Virginia, Attorney for Appellee.

McGRAW, Justice:

Appellants Carolyn M. Armor and Richard T. Armor, Jr. ("Appellants"), plaintiffs below,

appeal the January 19, 1999 and April 19, 1999 orders of the Circuit Court of Wood County, which granted summary judgment with respect to their legal malpractice claim against defendant George E. Lantz ("Lantz"). Lantz was retained by Appellants' Ohio lawyers for purposes of acting as local counsel in the filing a products-liability action in the United States District Court for the Southern District of West Virginia. The action in which Lantz acted as local counsel was later dismissed as time barred. Appellants assert that Lantz is (1) vicariously liable for the conduct of Ohio co-counsel, who erroneously chose to forego filing suit in Ohio, where, Appellants now claim, an action could still have been timely commenced; and (2) that he breached an independent duty owed to Appellants by failing to apprise Ohio co-counsel that West Virginia was not a viable forum, based upon the expiration of this jurisdiction's statute of limitation. We conclude that summary judgment was appropriate in this case, and therefore affirm the lower court's rulings on these issues.

## I.

## BACKGROUND

On June 3, 1991, appellant Carolyn Armor was involved in a motor vehicle accident in Wood County, West Virginia. The alleged cause of the accident was the failure of the right rear tire on the vehicle.

In June 1993, Appellants filed state-court actions against the maker of the tire, Michelin Tire Corporation ("Michelin"), in both the Circuit Court of Wood County, West Virginia, and the Court of Common Pleas of Washington County, Ohio. At this time, Appellants, who reside in Marietta, Ohio, were represented by, Dennis L. Sipe ("Sipe"), who

is licensed to practice law in the state of Ohio. Sipe later sought out and obtained the services of another Ohio lawyer, G. Rand Smith ("Smith"), who agreed to undertake representation in exchange for an even division of the fees generated by the case.

The West Virginia suit was dismissed on June 24, 1994, for failure to prosecute. It also later became apparent to Sipe and Smith that they would not be prepared for trial, which was slated for September 24, 1994. They had retained an expert who needed additional time and information to complete his investigation concerning the allegedly defective tire. There were, moreover, indications that the injuries sustained by Carolyn Armor as a result of the accident were beginning to increase in severity. When the Ohio court was unwilling to grant Appellants a continuance of the trial date, a voluntary dismissal without prejudice was obtained on September 19, 1994, pursuant to Rule 41 of the Ohio Rules of Civil Procedure.[1] Under the terms of the order entered by the Ohio court, Appellants had the right to refile their action within one year of the dismissal.[2]

On September 15, 1995, the Armors reinstituted litigation in the United States District Court for the Southern District of West Virginia. Sipe had approached Lantz approximately one or two months previously about acting as local counsel in the action.[3] Lantz had little recollection of the substance of this initial conversation, and Sipe testified at deposition that he had not gone into any detail about the case, other than to give a "thumbnail procedural history," including reference to the two previous dismissals in state court. The next contact between Lantz and Sipe concerning Appellants' case occurred on September 14, 1995, just one day prior to the

---

**1.** Rule 41(a)(2) of the Ohio Rules of Civil Procedure provides:

(2) By order of the court. Except as provided in subsection (1) an action shall not be dismissed at the plaintiff's insistence except upon order of the court and upon such terms and conditions as the court deems proper.... Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

**2.** The one-year limitation on refiling imposed by the Ohio court was in accord with Ohio Rev.

Code Ann. § 2305.19 (Anderson 1998), which states in pertinent part:

In an action commenced, or attempted to be commenced, if in due time a judgment for the plaintiff is reversed, or if the plaintiff fails otherwise than upon the merits, and the time limited for the commencement of such action at the time of reversal or failure has expired, the plaintiff ... may commence a new action within one year of such date....

**3.** Lantz had not been involved in the previously dismissed state-court actions.

complaint being filed in federal court. On that day, Sipe provided Lantz with a draft of the complaint,[4] which the two subsequently discussed in a telephone conversation. While it appears that there was some discussion regarding the timeliness of the complaint, with Sipe indicating that he intended to rely upon the Ohio savings statute,[5] it is undisputed that Lantz was never expressly requested to render an opinion regarding whether the complaint would be timely under West Virginia law. Sipe did testify, however, that he would have expected Lantz to bring to his attention any obvious statute-of-limitation defects. It is also uncontested that Lantz did not participate directly in the decision to forego refiling in Ohio. After reviewing the complaint, Lantz authorized Sipe to sign his name as local counsel.[6] Lantz later testified that he viewed his role as local counsel at this stage to be limited to reviewing the complaint as to form, that is, in Lantz's words, "Does this complaint state a cause of action and have all the particulars in it that are necessary and required in the Southern District of West Virginia . . . ."

After the action was filed in the District Court, Michelin moved for summary judgment on the ground that the action was time barred under W. Va.Code § 55–2–12(b) (1959), which imposes a two-year limitation period for bringing personal injury claims. The District Court granted Michelin's motion on April 23, 1996, ruling that the Ohio sav-

ings statute, which unlike its West Virginia analogue[7] applies to actions that have been voluntarily dismissed, did not apply to an action brought in West Virginia. Specifically, the federal court recognized that West Virginia adheres to the *lex loci delicti* doctrine of conflict-of-laws, whereby the substantive rights of the parties are determined by the law of the place of injury.[8] The court stated that "because the accident at issue occurred in West Virginia, West Virginia substantive law controls." The court also found that this jurisdiction's choice-of-law doctrine likewise determined the applicable procedural law. Consequently, the court determined that Appellants' claims were time barred under § 55–2–12(b), in that W. Va. Code § 55–2–18 did not apply to the voluntary dismissal entered by the Ohio court.[9] The District Court's ruling was later upheld on appeal. *See Armor v. Michelin Tire Corp.,* 113 F.3d 1231, 1997 WL 245217 (4th Cir.1997) (unpublished), *cert. denied,* 522 U.S. 915, 118 S.Ct. 301, 139 L.Ed.2d 232 (1997).

Appellants subsequently filed an action against Sipe, Smith, and Lantz in the Circuit Court of Wood County on May 19, 1998, alleging professional negligence and breach of contract with respect to the defendants' representation of Appellants. Lantz moved to dismiss the complaint on July 22, 1998, arguing that the statute of limitation had already run in West Virginia prior to his

4. Lantz had not been provided with any other written materials concerning the case, nor apparently did he request any such documentation.

5. Smith and Sipe had previously engaged in discussions regarding the most appropriate forum in which refile Appellants' action. Research prepared by Smith's office had indicated that an Ohio forum was likely to be unavailable, given limitations in Ohio's long-arm jurisdiction statute. Smith had voiced the opinion that an action filed in West Virginia would be subject to the Ohio savings statute, Ohio Rev.Code Ann. § 2305.19. *See* note 2, *supra.*

6. At no time did Lantz ever meet or talk with Appellants. Sipe had apparently obtained consent from Appellants for Lantz to act as local counsel, with the limitation that such engagement would not increase the overall fee in the case.

7. W. Va.Code § 55–2–18 (1985) permits a timely filed action that has been involuntarily dismissed for reasons other than on the merits, to be refiled within one year of the dismissal, even if such refiling is beyond the limitation period. Our cases have steadfastly held that a voluntarily dismissed action is not saved by this statute. *See, e.g., Henthorn v. Collins,* 146 W.Va. 108, 111, 118 S.E.2d 358, 360 (1961).

8. *See, e.g., Paul v. National Life,* 177 W.Va. 427, 432, 352 S.E.2d 550, 555 (1986) (*"Lex loci delicti* has long been the cornerstone of our conflict of laws doctrine.") (footnote omitted).

9. The District Court observed that "[i]f [Appellants] had filed this action in either a state or federal court in West Virginia by June 23, 1995, the cause of action would have been saved by West Virginia Code § 55–2–18 because the Wood County, West Virginia action was involuntarily dismissed because of the failure to prosecute. . . ."

participation in the case, and that as local counsel he "was not engaged or employed . . . to provide any services as attorney in the state of Ohio." The circuit court, treating Lantz's motion as having been made under W. Va. R. Civ. P. 56, granted summary judgment on January 19, 1999. Defendants Sipe and Smith subsequently settled with Appellants for an undisclosed sum, and a final order terminating the action was entered on April 19, 1999. This appeal followed.

## II.

### STANDARD OF REVIEW

▆▆ "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). As we have long stressed, "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963); *see also Painter*, 192 W.Va. at 192, 451 S.E.2d at 758. "Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party. . . ." Syl. pt. 2, in part, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995). The burden is upon the moving party to conclusively establish the absence of any dispute of material fact. *See* syl. pt. 6, *Aetna Casualty* ("A party who moves for summary judgment has the burden of showing that there is no genuine issue of material fact and any doubt as to the existence of such issue is resolved against the movant for such judgment.").

▆▆ Courts must strenuously avoid assuming the role of trier of fact in ruling on motions for summary judgment: "The circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Syl. pt. 3, *Painter, supra. See also Precision Coil*, 194 W.Va. at 59, 459 S.E.2d at 336 (" 'credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge' ") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202, 216 (1986)). Rather, where varying inferences may be drawn from the same evidence, we must view the underlying facts in a light most favorable to the non-moving party. *See Painter*, 192 W.Va. at 192, 451 S.E.2d at 758.

## III.

### DISCUSSION

Appellants present two basic arguments with respect to the circuit court's ruling granting summary judgment to Lantz. First, they claim that Lantz is vicariously liable for the malpractice of Ohio lawyers Sipe and Smith, based upon his association with them. Second, Appellants alleged that Lantz breached his duty to them by failing to alert Sipe and Smith to the statute-of-limitation problem confronting any litigation commenced in West Virginia. We consider these arguments in turn.

### A. *Vicarious Liability*

In asserting that Lantz is vicariously liable for the actions of co-counsel Sipe and Smith, based upon his association with them as local counsel, Appellants are essentially arguing that a joint venture was formed among these lawyers for purposes of prosecuting their case. We therefore turn to basic principles of joint-venture and partnership law to resolve this question.

▆▆ A joint venture "is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. It arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied." Syl. pt. 2, *Price v. Halstead*, 177 W.Va. 592, 355 S.E.2d 380 (1987). *See also* syl. pt. 4, *Sipple v. Starr*, 205 W.Va. 717, 520 S.E.2d 884 (1999); syl. pt. 2, *Johnson v. State Farm Mut. Auto. Ins. Co.*, 190 W.Va. 526, 438 S.E.2d 869 (1993); *Nesbitt v. Flaccus*, 149 W.Va. 65, 73–74, 138 S.E.2d 859, 865 (1964). While this Court has

frequently likened a joint venture to a partnership, *e.g., Price,* 177 W.Va. at 595, 355 S.E.2d at 384, we have nevertheless distinguished the two: "[A] partnership relates to a general business ... while [a] joint adventure relates to a single business transaction." *Nesbitt,* 149 W.Va. at 74, 138 S.E.2d at 865. *See also Lilly v. Munsey,* 135 W.Va. 247, 254, 63 S.E.2d 519, 523 (1951) (joint venture "is sometimes called a limited partnership; not limited as to liability, but as to its scope and duration") (citation omitted); *Gelwicks v. Homan,* 124 W.Va. 572, 578, 20 S.E.2d 666, 669 (1942) ("Joint adventure is akin to partnership, and one of the distinctions is that, whereas a partnership relates to a general business of a certain type, joint adventure relates to a single business transaction.") (citing *Kaufman v. Catzen,* 100 W.Va. 79, 130 S.E. 292 (1925)).

▪ Because of the basic similarities between these two forms of business association, joint ventures and partnerships are governed generally by the same basic legal principles. *See generally,* 46 Am.Jur.2d *Joint Ventures* § 3, at 22 (2d ed. 1994) ("The relations of the parties to a joint venture and the nature of their association are so similar and closely akin to a partnership that their rights, duties, and liabilities are generally tested by rules which are closely analogous to and substantially the same, if not exactly the same as those which govern partnerships.") (footnotes omitted). Thus, since all partners are jointly liable for all debts and obligations of a partnership, *see* W. Va.Code § 47B-3-6(a) (1996), members of a joint venture are likewise jointly and severally liable for all obligations pertaining to the venture, and the actions of the joint venture bind the individual co-venturers.

▪ Our primary concern here, of course, is whether Lantz's assent to acting as local counsel was sufficient to constitute an express or implied agreement to form a joint venture. This Court has never formulated any broad analytical test by which to determine the existence of a joint venture. In *Pownall v. Cearfoss,* 129 W.Va. 487, 40 S.E.2d 886 (1946), however, the Court did note the existence of certain "distinguishing elements or features" essential to the creation of a joint venture:

> As between the parties, a contract, written or verbal, is essential to create the relation of joint adventurers.... To constitute a joint adventure the parties must combine their property, money, efforts, skill, or knowledge, in some common undertaking of a special or particular nature, but the contributions of the respective parties need not be equal or of the same character. There must, however, be some contribution by each party of something promotive of the enterprise.... An agreement, express or implied, for the sharing of profits is generally considered essential to the creation of a joint adventure, and it has been held that, at common law, in order to constitute a joint adventure, there must be an agreement to share in both the profits and the losses. It has also been held, however, that the sharing of losses is not essential, or at least that there need not be a specific agreement to share the losses,[10] and that, if the nature of the undertaking is such that no losses, other than those of time and labor in carrying out the enterprise, are likely to occur, an agreement to divide the profits may suffice to make it a joint adventure, even in the absence of a provision to share the losses.

*Id.* at 497–98, 40 S.E.2d at 893–94 (citations omitted) (footnote added). *See also Lilly v. Munsey,* 135 W.Va. at 254, 63 S.E.2d at 523 ("to constitute a joint adventure there must be an agreement to combine property or efforts and to share in profits."). Whether or not a joint venture exists is normally a question to be answered by the trier of fact. *See Bowers v. Wurzburg,* 207 W.Va. 28, 528 S.E.2d 475, 484 (1999).

Our most recent cases have concentrated primarily upon the presence or absence of an agreement to share in the profits and losses

---

**10.** Prior to *Pownall,* the Court had indicated that, where a joint venture is otherwise established, there is an implied agreement among joint venturers to share losses and profits equally. In *Gelwicks v. Homan, supra,* we stated that

"[i]f one member of the adventure sustains losses, he is entitled to contribution from his fellow-adventurers, and will be required to account to them for any profits he may receive personally." 124 W.Va. at 578, 20 S.E.2d at 669.

of an enterprise. In *Kerns v. Slider Augering & Welding, Inc.*, 202 W.Va. 548, 505 S.E.2d 611 (1997) (per curiam), the plaintiff was injured in a mining accident, and sought recovery in a deliberate intention action from both his employer and the firm for which it was performing mining operations, claiming that both were involved in a joint venture. In rejecting this argument, the Court in *Kerns* emphasized the fact that the plaintiff's employer was being paid a per-ton price for the coal extracted, and therefore there was no joint venture because there was no evidence that the two firms had "agreed to share profits and losses." *Id.* at 556, 505 S.E.2d at 619. More recently, in *Bowers v. Wurzburg, supra,* we were confronted with the issue of whether a lessor of property could be held liable for the actions of a lessee under a joint-venture theory of liability, where the lessor had a contractual right to a percentage of the lessee's gross sales. While the Court in *Bowers* recognized that "the mere existence of a 'percentage clause' [does not] automatically create[ ] a joint venture," 207 W.Va. at 38, 528 S.E.2d at 485,[11] we also observed that such a contractual right could nevertheless "be used to grant a landlord a substantial share in the tenant's business, suggesting a relationship beyond that of landlord and tenant," *id.* Consequently, the *Bowers* Court went on to hold that summary judgment in favor of the lessor was inappropriate, since "a 'percentage clause' in a commercial lease, whereby the landlord receives a percentage of sales or profits in addition to or in lieu of the base rent, may be viewed as evidence that a joint venture exists." *Id.*

In the context of determining whether lawyers have formed a joint venture for purposes of vicarious liability, other courts have likewise concentrated upon whether there is an agreement to share in the potential profits and losses of the representation. In *Duggins v. Guardianship of Washington,* 632 So.2d 420 (Miss.1993), the guardianship of a minor child brought suit for an accounting against two lawyers who had represented the child in a medical malpractice action. One of

the lawyers had misappropriated a portion of the funds obtained from settlement. The Mississippi Supreme Court held that the second lawyer, who had not engaged in any improper conduct, was nevertheless vicariously responsible, stating that "the intent to share both the responsibility and profits from th[e] representation clearly demonstrate the presence of a joint venture." 632 So.2d at 428. This holding was predicated in large part upon the fact that the two lawyers had agreed to split equally the fees generated by the case. *Id.* at 426. *See also Fitzgibbon v. Carey,* 70 Or.App. 127, 688 P.2d 1367 (1984) (finding joint venture between law firms based upon, *inter alia,* agreement to divide fees equally); *Floro v. Lawton,* 187 Cal. App.2d 657, 10 Cal.Rptr. 98 (1960) (joint venture found based upon agreement between lawyers to share fees on equal basis).

The Virginia Supreme Court in *Ortiz v. Barrett,* 222 Va. 118, 278 S.E.2d 833 (1981), applied similar reasoning to reject a claim of vicarious liability. In *Ortiz,* lead counsel Edward Barrett, who was not licensed to practice law in Virginia, filed a personal injury suit in Virginia on behalf of his clients, signing the name of Ronald Barrett, an unrelated Virginia lawyer. Ronald had not authorized Edward to sign the pleading, and when Ronald later became aware that suit had been filed under his signature, he agreed to serve as "co-counsel without active participation" for a fixed fee. 222 Va. at 124, 278 S.E.2d at 835. In holding that Edward's subsequent mishandling of the case did not impose liability on Ronald, the Virginia court reasoned that Edward and Ronald were not joint venturers, based upon the fact that "Ronald was employed by Edward to perform limited services for a fixed fee regardless of results." *Id.* at 131, 278 S.E.2d at 840.

One noted commentator has echoed the *Ortiz* court's reluctance to find vicariously liable based solely upon the lawyers status as local counsel:

> A rule commonly encountered is that a lawyer from another jurisdiction·must as-

---

11. *Cf.* W. Va.Code § 47B–2–2(c)(2) ("The sharing of gross returns does not by itself establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived.")

sociate with local counsel when temporarily appearing in litigation in a state .... In most such situations the designated local lawyer plays a largely passive role. Courts should therefore be reluctant to visit the local lawyer with vicarious liability. But if the relationship is one of more nearly equal responsibility, authority, and profit sharing, it may fit the legal description of a joint venture, permitting an injured party to hold both foreign and local lawyer to joint and several liability.

Charles W. Wolfram, *Modern Legal Ethics* § 5.6.6, at 238 (1986) (footnotes omitted).

▮ In the present case, it is undisputed that there were no discussions between Lantz and Sipe concerning how Lantz would be paid. Indeed, Sipe testified that in another case in which both he and Lantz were involved, Lantz had received a flat $1,000 fee for acting as local counsel. By contrast, Sipe and Smith had agreed in this case to share the expenses and fees equally. While Lantz did testify at deposition that he expected to be compensated for his services, this falls far short of demonstrating the requisite agreement to share in the profits and losses of the joint representation.

Other courts delineating the contours of joint ventures have also emphasized the necessity of joint venturers having equal control over the common commercial pursuit.

"An essential element of a partnership or joint venture is the right of joint participation in the management and control of the business.... Absent such right, the mere fact that one party is to receive benefits in consideration of services rendered or for capital contribution does not, as a matter of law, make him a partner or joint venturer." *Bank of California v. Connolly*, 36 Cal. App.3d 350, 364, 111 Cal.Rptr. 468, 478 (1973) (citations omitted). As one Illinois court observed, "[p]ossibly the most important criterion of a joint venture is joint control and management of the property used in accomplishing its aims." *Barton v. Evanston Hosp.*, 159 Ill.App.3d 970, 974, 111 Ill.Dec. 819, 513 N.E.2d 65, 67 (1987) (citation omitted).[12] Importantly, "[t]he control required for imputing negligence under a joint enterprise theory is not actual physical control, but the legal right to control the conduct of the other with respect to the prosecution of the common purpose." *Slaughter v. Slaughter*, 93 N.C.App. 717, 721, 379 S.E.2d 98, 101 (1989) (citation omitted).

Our review of the record fails to uncover any evidence showing that Lantz agreed to undertake active management and control of Appellants' lawsuit in federal court. Although raised only obliquely, Appellants suggest that the District Court's requirement regarding the association of local counsel [13]

12. *See also McSorley v. Hauck*, 883 S.W.2d 562, 566 (Mo.App.1994) (essential that each joint venturer have "an equal voice, giving an equal right of control in the direction of the enterprise"); *Brown v. Jones*, 200 Mich.App. 212, 218–19, 503 N.W.2d 735, 738 (1993) ("A joint enterprise will be found only where it can be shown that every member ha[s] management and control of the enterprise, a right to be heard, and an equal right of control and joint responsibility for decision making and expenses."); *Hill v. Zimmerer*, 839 P.2d 977, 981 (Wyo.1992) (noting that each party must have "an equal voice in control and direction of the undertaking"); *Ackerman v. Landes*, 112 A.D.2d 1081, 1082, 493 N.Y.S.2d 59, 60 (1985) (among essential elements of a joint venture is "some degree of joint proprietorship and control over the enterprise").

13. The District Court's rule concerning visiting attorneys is set forth in Rule 2.02 of its Local Rules of General Practice and Procedure, which provides as follows:

Any person who has not been admitted to practice before the Supreme Court of Appeals of West Virginia, but who is a member in good standing of the bar of the Supreme Court of the United States, the bar of the highest court of any other state in the United States, or the bar of the District of Columbia, shall be permitted to appear as a visiting attorney in a particular case *in association with a permanent member of the bar of this court* as herein provided. The visiting attorney shall file with the clerk, at or before his or her initial appearance, a statement identifying by name and address the bar of which he or she is a member in good standing and designating some permanent member of the bar of this court who has an office for the practice of law in this district upon whom pleadings, notices and other papers may be served. The permanent member of the bar of this court so designated shall consent to the designation and shall thereafter sign all papers that require the signature of an attorney. Any paper filed by a visiting attorney not in compliance with this rule may be stricken from the record after fifteen days' written notice mailed to the visiting attorney at his or her address as known to

implies an agreement regarding joint control over the lawsuit. We are not persuaded by this argument. Rule 2.02 does require that a visiting attorney "associate" with a permanent member of the District Court's bar, and that such local counsel sign all pleadings; however, the rule also permits local counsel to "be excused from further attendance during the proceedings" by consent of court. The rule is ambiguous as to the precise responsibilities of local counsel, and, while it certainly calls upon local counsel to perform a supervisory role with respect to visiting counsel, it does not necessarily require that local counsel take equal charge of preparing and prosecuting a case. Consequently, we conclude that Appellants have failed to raise a triable issue of fact as to whether a joint venture existed in this case.

### B. *Breach of Duty to Client*

Appellants further argue that Lantz is liable for malpractice because he breached a duty that was owed to them in connection with his capacity as local counsel. More specifically, they claim that Lantz was negligent in failing to comprehend and communicate the fact that no suit could be brought in West Virginia because the statute of limitation had irreversibly lapsed. Appellants contend that had Lantz discharged this purported duty, they or their agents would have been put on notice as to the necessity of timely refiling their lawsuit in Ohio. Lantz argues in reply that his responsibilities as local counsel did not extend to determining whether Appellants' lawsuit was time-barred under West Virginia law, primarily because Appellant's Ohio lawyers undertook this task themselves, and neither requested him to render such an opinion, nor provided him with the necessary information upon which to base such a determination.

 To prevail on their claim of legal malpractice, Appellants must prove: (1) that Lantz was employed to represent them; (2) that Lantz neglected a reasonable duty; and (3) that such negligence resulted in and was

the proximate cause of their loss. *See Keister v. Talbott*, 182 W.Va. 745, 748–49, 391 S.E.2d 895, 898–99 (1990); *see also McGuire v. Fitzsimmons*, 197 W.Va. 132, 137, 475 S.E.2d 132, 136–37 (1996). Here, we are concerned with the second prong of this test—namely, whether Lantz had a duty to undertake the task of determining whether Appellants were time-barred in this jurisdiction. We find that, under the unique circumstances in this case, there was no such duty.

Before launching into an analysis of this question, we find it necessary to clarify the pertinent facts. Contrary to Appellants' assertions that Lantz did not recognize or alert co-counsel regarding the statute of limitation problem, the record shows that Lantz and Sipe in fact briefly discussed this matter prior to the filing of the complaint. Lantz recalled having "had some ... conversation [with Sipe] about why this was still a viable cause of action." Sipe's testimony at his deposition appears to support this recollection, although he did note that "I did not specifically ask [Lantz] the question, ... will the savings statute in West Virginia save us.... [or] should I file in Ohio because West Virginia's savings statute won't help ... that sort of discussion did not take place." The evidence is undisputed that Lantz was given at most only a "thumbnail procedural history" of the case prior to being provided with the draft complaint, and that there was neither any request of, nor offer by, Lantz to render any opinion as to whether suit in West Virginia was time-barred, or the advisability of refiling in Ohio rather than this state. Sipe testified that the decision to refile in federal court in West Virginia was based upon research performed by Smith's office, and that "[w]e came to [Lantz] with a decision made, we are filing here [in West Virginia]." Sipe further stated as follows:

Q. [E]ven through the date of filing, you made the decision to file in West Virginia based on discussions and advice given by Mr. Smith and from research provided from Mr. Smith's office?

the clerk. Upon compliance with this rule and introduction of the visiting attorney to the court by the sponsoring permanent member of this court's bar, the sponsoring attorney, with the consent of the court, may be excused from

further attendance during the proceedings and the visiting attorney may continue to appear in that particular case.
(Emphasis added.)

A. Correct.

Q. And Mr. Lantz was not a party to any of those discussions or did not participate in any fashion in those discussions?

A. That's correct.

Q. Similarly Mr. Lantz did not participate in the decision not to refile in Ohio in September 1995 at the same time this suit was being filed in the southern district of West Virginia?

A. That's correct.

Lantz testified that he was merely asked to review the complaint as to form, and that he was never asked to participate in the decision as to which forum Appellants should pursue their claims.

On these facts, the question that must ultimately be answered is whether Lantz's duty to his clients could properly be limited to performing the tasks assigned to him by Sipe and Smith, Appellants' primary agents for prosecuting their claims. As cases from other jurisdictions readily demonstrate, there are competing policies at stake here.

There is law supporting Lantz's argument that local counsel's duty to the client may be limited based upon the specific responsibilities assigned to local counsel. This issue was addressed in *Ortiz v. Barrett, supra*, where the Virginia Supreme Court held:

> Ronald [Barrett] owed the duty to Edward [Barrett] of exercising reasonable care, skill, and diligence in performing the tasks for which Edward employed him. He also had an implied obligation to the clients, with whom he had no direct contact or understanding, to exercise the same degree of care in performing such professional services as their agent, Edward, required of him. The mere absence of an express contract between Ronald and the clients would not enable Ronald to avoid liability to them for damages caused by his negligence in the discharge of his assigned duties. Therefore, the services performed by Ronald are to be measured by the same standard applicable to Edward's services, but the services themselves differed, and Ronald's duty was *limited to the work assigned* to him by Edward.

222 Va. at 128, 278 S.E.2d at 838 (emphasis added). The *Ortiz* court found that Ronald was not liable, because "Ronald, rather than ignoring the interests of the clients, exerted himself in their behalf to the extent the constraints of his contractual authority permitted him to do so." *Id.* at 131, 278 S.E.2d at 840.

The Eighth Circuit Court of Appeals took a similar approach in *Macawber Eng'g, Inc. v. Robson & Miller*, 47 F.3d 253 (8th Cir. 1995). In *Macawber*, the plaintiff-client brought a legal malpractice claim against a law firm that had acted as its local counsel in defending a breach of warranty action. Lead counsel in the underlying case failed to answer certain requests for admission, which resulted in partial summary judgment against the client. The court in *Macawber* held that local counsel was not liable, stating that the "[l]ocal counsel does not automatically incur a duty of care with regard to the entire litigation. When the client vests lead counsel with primary responsibility for the litigation, the duty of local counsel is limited." 47 F.3d at 257 (citing *Ortiz, supra*). The Eight Circuit went on to explain the policy basis for this conclusion:

> Were the law otherwise, the costs involved in retaining local counsel would increase substantially. Confronted with a duty to monitor lead counsel's handling of the litigation, local counsel would be bound to review all manner of litigation documents and ensure compliance with all deadlines. Out-of-state litigants would be forced to pay a local attorney to review lead counsel's work. Given the skyrocketing costs of litigation, the duplication of effort and increased fees that would result from such a rule foster problematic public policy. Though some litigants may choose to enter a representation agreement which includes extensive duties for local counsel, Minnesota law does not (and should not) require them to do so.

47 F.3d at 257–58 (footnote omitted).

West Virginia authority supports the notion that a lawyer's duty may be limited by the terms of the attorney-client relationship. Rule 1.2(c) of the West Virginia Rules of Professional Conduct provides that "[a] law-

yer may limit the objectives of the representation if the client consents after consultation." This principle is illustrated by *State v. Layton,* 189 W.Va. 470, 432 S.E.2d 740 (1993). In *Layton,* the defendant claimed ineffective assistance of counsel where he had chosen to proceed *pro se* with limited assistance provided by so-called "standby counsel." This Court rejected the defendant's claim, quoting with approval the following language: " 'To prevail on a claim that counsel acting in an advisory or other limited capacity has rendered ineffective assistance, a self-represented defendant must show that counsel failed to perform competently *within the limited scope of the duties assigned to or assumed by counsel.*' " 189 W.Va. at 486, 432 S.E.2d at 756 (quoting *People v. Bloom,* 48 Cal.3d 1194, 259 Cal. Rptr. 669, 688–89, 774 P.2d 698, 717–18 (1989)) (emphasis in original).

In contrast to *Ortiz* and *Macawber,* where the courts found that the duties of local counsel were limited, there is a competing line of cases that emphasize the responsibilities placed upon local counsel by various rules of practice.[14] At least one court has expressly rejected "the view that some counsel have only limited responsibility and represent a client in court in a limited capacity, or that the local counsel is somewhat less the attorney for the client than is lead counsel." *Gould, Inc. v. Mitsui Mining & Smelting Co.,* 738 F.Supp. 1121, 1125 (N.D.Ohio 1990). The court in *Gould* was faced with the question of whether a client's consent to a conflict of interest on the part of local counsel remained effective after the law firm in question took a more prominent role in the litigation. The court rejected the argument that the consent was exclusively limited to counsel's role as local counsel, noting that "[t]he Federal Rules of Civil Procedure and the Local Rules for the Northern District of Ohio

do not recognize any lawyers as less than full advocates for their clients." *Id.* The *Gould* court emphasized that Fed.R.Civ.P. 11 "places stringent obligations on all counsel signing pleadings, however designated." *Id.*

A federal district court in New Jersey took an even more forceful position on this issue in *Ingemi v. Pelino & Lentz,* 866 F.Supp. 156 (D.N.J.1994). In that case, decided under New Jersey practice rules, the plaintiff had initially contacted the New Jersey office of Pelino & Lentz, where she indicated her desire to retain a New Jersey law firm. The plaintiff's case was, however, subsequently handled by Pelino & Lentz, P.C., a Philadelphia firm that, while closely related to the New Jersey firm of the same name, was nevertheless legally distinct. The New Jersey office acted as local counsel. A legal malpractice action was later brought against both the New Jersey and Philadelphia firms. The New Jersey defendants sought dismissal, asserting that they had merely acted as local counsel, in which capacity they "performed ministerial tasks, and pursued discovery and motion practice in a manner which did not require making judgments or giving advice regarding prejudgment remedies or settlements." 866 F.Supp. at 159. The federal district court denied the motion to dismiss, strongly rejecting the assertion that the role of the New Jersey defendants in acting as local counsel was limited:

> [D]efendants underestimate the role of local counsel. By minimizing Pelino & Lentz's role, defendants actually raise questions concerning both P.C.'s authority to appear *pro hac vice* and Pelino & Lentz's conduct. If Pelino & Lentz's role in the underlying litigation was as insignificant as defendants suggest, this court is left wondering whether Pelino & Lentz adequately supervised the work of P.C. employees as required by New Jersey

14. *Ortiz* in fact considered the effect of Virginia's rules pertaining to the association of local counsel, but concluded that such requirements did not "require[ ] the alteration of the contractual agreement between a foreign attorney and his client so that local counsel in Virginia will replace the foreign attorney as chief or lead counsel for the client." *Ortiz,* 222 Va. at 126–27, 278 S.E.2d at 838–39. In reaching this conclusion, the Virginia Supreme Court construed that

state's local association requirement as having the limited purpose of permitting "our courts [to] have access to attorneys of record who are personally subject to their supervisory control rather than risk delays in communicating with foreign attorneys who may be inaccessible, uncooperative or unfamiliar with the rules and statutes governing the trial of cases in Virginia." *Id.* at 127, 278 S.E.2d at 839.

practice rules and whether a New Jersey plaintiff's legal interests were safeguarded. *Id.* at 161. After reviewing the New Jersey rules of practice, the court stated, "local counsel is counsel of record with attendant responsibilities, *not* out-of-state counsel admitted *pro hac vice*," *id.* (emphasis in original), and "[l]ocal counsel must also supervise the conduct of *pro hac vice* attorneys and must appear before the court in all proceedings," *id.* at 162. Further, the court noted that "this court trusts that responsible local counsel is aware of the import of signing a pleading and a concomitant duty owed to clients." *Id.* Finally, the court rejected any passive role for local counsel, stressing that "necessarily then, Pelino & Lentz should have actively represented plaintiff and could not be, as defendants argue, merely a convenient vehicle for a Pennsylvania firm." *Id.*

As these cases attest, any attempt to delineate the scope of local counsel's duty to the client must contend with a number of competing factors. Not the least of these considerations is that in some cases a client's trust and confidence may reside primarily with an out-of-state lawyer. In such circumstances, an active role undertaken by local counsel could appear to erode the intentions of the client. Moreover, in many cases, including it appears the case *sub judice*, a lawyer may be expressly hired to play only a limited role in a particular matter. Thus, to impose liability in such circumstance would be contrary to the knowledge and agreement of the contracting parties. *See* David J. Beck, *Legal Malpractice in Texas* 547, 644 (1998).

However much we may appreciate the policy problems inherent in imposing mandatory, non-delegable duties upon local counsel, the fact remains that the rules requiring visiting attorneys to associate with local counsel were adopted by this and other jurisdictions with valid and specific aims in mind. We agree with the basic approach taken by the *Ingemi* court, and therefore hold that the duties of a lawyer acting as local counsel, while they may be limited by contractual agreement between lawyer and client, generally may not fall beneath the responsibilities expressly or impliedly imposed by the relevant rules of practice pertaining to the association of local counsel. The primary purpose behind these rules is to both protect the client by insuring the integrity and competency of the lawyers that practice before courts situated in this state, *see State ex rel. H.K. Porter Co., Inc. v. White*, 182 W.Va. 97, 101, 386 S.E.2d 25, 29 (1989), and to safeguard the efficient operation of judicial tribunals by ensuring counsel's availability, accessibility, and accountability to litigants, other counsel, and the judiciary, *cf. Parnell v. Supreme Court of Appeals of West Virginia*, 926 F.Supp. 570, 574 (N.D.W.Va.1996). The rules governing the responsibilities of local counsel that have been adopted both by this Court and at least one of the federal district courts sitting in West Virginia should make clear to all concerned that lawyers acting as local counsel incur significant responsibility with respect to cases in which they undertake supervision of visiting counsel. We now make clear that, at least with respect to Rule 8.0(c) of the West Virginia Rules for Admission to the Practice of Law,[15] local counsel are expected to perform more than a mere perfunctory role.

---

**15.** Rule 8.0(c), which was recently amended effective July 1, 2000, provides, in part:

The applicant [for *pro hac vice* admission] shall be associated with an active member in good standing of the state bar, having an office for the transaction of business within the State of West Virginia, who shall be a responsible local attorney in the action, suit, proceeding or other matter which is the subject of the application, and service of notices and other papers upon such responsible local attorney shall be binding upon the client and upon such person. *The local attorney shall be required to sign all pleadings and affix the attorney's West Virginia State Bar ID number thereto, to attend all hear-*

*ings, trials or proceedings actually conducted before the judge, tribunal or other body of the State of West Virginia for which the applicant has sought admission pro hac vice.* The local attorney shall further attend the taking of depositions and other actions that occur in the proceedings which are not actually conducted before the judge, tribunal or other body of the State of West Virginia for which the applicant has sought admission pro hac vice, and *shall be a responsible attorney in the matter in all other respects.* In order to be a "responsible local attorney" the local attorney must maintain an actual physical office equipped to conduct the practice of law in the State of West Virginia, which office is the primary location

However, we are neither prepared, nor in this case called upon, to delineate the specific contours of this jurisdiction's rules governing the association of local counsel. Rather, here we must assess Lantz's performance in the context of the requirements imposed by the court before which he appeared. As we have already indicated, the extent of the mandatory requirements imposed upon local counsel in the Southern District of West Virginia are less than clear. This Court is therefore hesitant to impute to this rule the requirement that local counsel undertake active and exhaustive participation in a case.

Moreover, even assuming such broad responsibility on the part of local counsel, Lantz would have only been accountable for the commencement and conduct of the litigation undertaken in West Virginia, not for the more wide-reaching strategic decision to refile in West Virginia rather than Ohio. It is important to note that the statute of limitation had, in fact, run in this jurisdiction before Lantz even reviewed the complaint. The draft complaint was provided to Lantz just five days before the statute of limitation would have run, even under Sipe and Smith's mistaken theory. Given his eleventh-hour involvement in the case, we discern no impropriety in Lantz's accepting Ohio counsel's reasoning as to why the complaint could still be timely filed in West Virginia.[16] There is no evidence in the record demonstrating that Lantz either participated in or offered to undertake broad inter-jurisdictional responsibilities on behalf of Appellants, and we therefore see no reason to conclude that Lantz breached a duty by failing to ascertain with complete certainty that the complaint would be timely if filed in federal court in West Virginia. To charge Lantz with negligence in connection with the failure to refile in Ohio would, moreover, require that we imbue him with both knowledge of Ohio procedural law, as well as a corresponding awareness of the continued viability of refiling suit in that jurisdiction, neither of which is supported by the record. Consequently, we conclude that the circuit court was correct in granting summary judgment on the basis that Lantz did not breach a duty owed to Appellants.

## IV.

## CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Wood County is affirmed.

Affirmed.

from which the "responsible local attorney" practices law on a daily basis. The responsible local attorney's agreement to participate in the matter shall be evidenced by the local attorney's endorsement upon the verified statement of application, or by written statement of the local attorney attached to the application.

. . . .

(Emphasis added.) We note that the United States District Court for the Northern District of West Virginia has, in Rule 2.02 of its Local Rules of General Practice and Procedure, incorporated by reference the procedural and substantive requirements contained within Rule 8.0(c).

16. Rule 11(b)(2) of both the Federal and West Virginia Rules of Civil Procedure imposes upon counsel the obligation to ensure that "the claims, defenses, and other legal contentions ... [contained within a pleading] are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Lantz, as local counsel, was ethically bound to avoid the filing of a complaint that was obviously time-barred. *See, e.g., McHenry v. Utah Valley Hosp.,* 927 F.2d 1125, 1126 (10th Cir.1991) (application of Rule 11 sanctions to action that was obviously time barred); *United State v. Gavilan Joint Community College Dist.,* 849 F.2d 1246, 1251 (9th Cir.1988) (same). Yet, while the theory advanced by Sipe and Smith misapprehended applicable law, it was not so frivolous as to constitute sanctionable conduct.